Good morning everyone and welcome to the Ninth Circuit. We're very pleased to be here in Phoenix and we appreciate the beautiful weather you got for us today. We will call the cases in the order of the day sheet. The first case for argument is United States v. Jose. May it please the court. Good morning, your honors. Jay Nelson on behalf of Donnie Jose. I'll do my best to watch my own clock and I'll try to reserve two minutes for rebuttal. Unless the court prefers something otherwise, I'd like to focus my time this morning on three issues, if I can squeeze them in. First, the domestic violence issue and second, both aspects of the cologne issue. Now on the domestic violence, we've identified four instances of testimony that violated the district courts in limine order. And how many were objected to? One, your honor. Which one was that? It was the one from Delilah on ER 216 when she was asked, I'm sorry, 123. And she said they get into it here and there. Now, of course, your honor, we have identified case law binding in this circuit, which holds that when there's a limine ruling, there's no need to. When there's a ruling that denies a motion in limine, then an objection later is going to be futile. Is there any authority that suggests when a motion in limine is granted, counsel doesn't have the responsibility of raising an objection at the time? I'm not aware of a case citation. I don't think there is one. And it seems to me it's entirely different. And the judge is sitting there, he said, okay, this is how I'm going to rule, waits for the objection and no objection comes. So I'm not sure why it is that plain air doesn't apply here. The government asked for permission to introduce evidence of prior domestic violence and the district court said no. I think that with that background for the government then to elicit testimony, even if it didn't do it intentionally, but for the testimony to come in, which the district court has said no pre-trial, I think that violates the order. And usually when you object, it's because it violates something, rules of evidence or something, and there's an objection. And the objection is sustained if the judge agrees with it. There's no objection here. So again, I know of no authority myself, and you've cited none that suggests in that circumstance an objection is not required in order to avoid the plain air standard. I think the logic of the Wood case we've cited applies, Your Honor. I don't think it applies at all. It's backwards. In that case, you've got an objection that was rejected by the court. To renew it later is futile. That's not the situation here. There's nothing futile about making an objection when you think admissible, inadmissible testimony is being asked for. I'm not sure it entirely turns on futility. I mean, the analysis here would be if you ask for permission, you anticipate the issue and you go to the court and you say, we want to do this, please let us. And the district court says no. When the district court has said no, the district court has said no. Let me move to another aspect of the same concern, which is that if there's not an objection and if the question doesn't explicitly seek testimony about domestic violence and indeed doesn't get a response that makes specific reference to domestic violence, how is it the courts are not supposed to be able to figure out that the question has gone into forbidden territory when defense counsel apparently hasn't figured out it's gone into forbidden territory? I don't see the errors at all playing in that circumstance. Well, I think these answers, questions and answers, do explicitly get to the question of domestic violence. Then why wasn't there an objection? I can't speak for defense counsel, Your Honor. Well, it seems to me the most logical explanation is that defense counsel didn't recognize that's what it was getting to because the questions themselves don't appear to say, did he ever beat you up? Well, there are shades, of course, of how explicit we're going to be. But look at ER 216, Your Honor. The issue was, how did Miguel know that Mr. Jose was stabbing her? And she said, because Donnie's always doing things. There's a clear implication. ER 217, the issue was, how did Miguel know that Mr. Jose was shaking her? She says, I know how he handles me. ER 228, this might be the most egregious one. Question, why did you indicate Donnie as the one who stabbed you? Her answer, because I know what he does to me. So applying common sense, Your Honor, these are not questions designed to elicit how gentle, loving, and benign Mr. Jose was in his relationship with Ms. Miguel. These are questions and answers that deliberately draw, explicitly draw a correlation between the prior rough handling, rough treatment, domestic violence that was alleged against Mr. Jose and the identity of him as the assailant now. And that is exactly the propensity evidence that the district court precluded. And it's exactly the kind of evidence that a juror who might be wavering and harboring reasonable doubt, and we know there was one or more in this case because they came back hung and didn't return a guilty verdict until there was an Allen charge, would lean on without any guidance from the district court about how to handle it. You try to fill in the blanks and you say, well, there was this idea from the testimony, at least four instances of it, where clearly he seems to have been rough with her. She knows she's shaking him because of how he handles her. We usually worry that propensity evidence is very inflammatory, but there's no detail here that's inflammatory. So how does it raise that same concern? Well, the context is crystal clear, Your Honor. I mean, why did you indicate Donnie as the one who stabbed you? Because I know what he does to me. She's describing him as a person who would stab her based on her prior experience with him. It's crystal clear, Your Honor. And she could have said, well, he's pointed knives at me before and stuff like that. But that was, you know, this whole line of inquiry was precluded by the district court pretrial. And we have the government's assurances that it went over these issues with the witnesses beforehand, and so it's not hard to imagine that the witnesses were trying to keep it vague, keep it general. But it's really not. I mean, it's crystal clear what they're getting at. There was rough history between these two people, violent, acrimonious history between these two people, and it comes through in at least four instances of the testimony. If I could pivot, Your Honor, to try to squeeze in some discussion of Cologne unless the Court has further questions on the domestic violence. Thank you. So we've challenged the Cologne issue in two different ways. One is the granting of the government's morning of trial request for continuance, and the second is the open-the-door ruling on the preclusion. Now, obviously there are analytical and conceptual differences between those two, but I think there's a common thread that runs between them both, and it's a fundamental unfairness that even though it was the government that skewed the adversary process in this case by untimely disclosing this really critical evidence about supporting Miguel's identification. Could you help me understand what the basis was for the claim that the government had violated the disclosure agreement? Based on the record, it appeared that it was the tribal government that had possession of this and the government didn't have possession of it until the day before it produced it. So was there – I didn't see anything in the disclosure agreement relating to items in the possession of the tribal government. So help me make that connection. Sure. Can I answer that in two ways, first procedurally and second substantively? Procedurally, I contend, and I'm asking the Court not even to address that issue in its ruling in this case. The trial prosecutor, Mr. Jose's trial lawyer, and the district court all agreed that there was a violation. So whether you view it as a matter of waiver under Perez or a matter, frankly, of judicial estoppel, I don't think that issue was properly before the Court, but obviously the Court has asked a question, and so I would direct the Court to ER 317. That's where the disclosure agreement is, and I answer the question by pointing to four aspects of it. Number one is the preamble, and the preamble says the whole point of this agreement is to produce evidence in a timely fashion so we can resolve the case and everything is above board, and the government has shown its cards to the defense. Paragraph 1, of course, which is what Your Honor was just referring to, that refers to early janks, and there's an assumption that Mr. Jose was entitled to rely on, that he was going to get early janks. But there's others, too. If you look at the – But the janks relates to items that the government has. Is there anything in the disclosure agreement that imposed an obligation on the government to ask the tribal government for what they had, or are you just saying that's implicit? It's definitely implicit, and there's more in the agreement that supports that. But is there anything expressed that requires that? Not expressed. But if I could move on, Your Honor, to build it. And, of course, this is basically a contract analysis, I would contend, Your Honor. Could you explain how your case would have been stronger if you'd had this evidence a month earlier than trial? I mean, it seems that your main argument is we would have been better off if this evidence never came in, and I'm sure that's true. But if it had been disclosed, it would have come in if it had been disclosed two months earlier, say. So what difference would it have made to your case if you'd known about this in a more timely way compared to how it played out? Well, as the government repeatedly pointed out below, Your Honor, it's not Brady. It's not exculpatory evidence. It's inculpatory evidence. It's bad for Mr. Jose. So it would – But the prejudice comes not from the late disclosure. The prejudice comes from its existence. Well, the prejudice comes from the fact that Mr. Jose based his entire defense to this case on the absence of this evidence. But you had two weeks to figure that out. That doesn't answer Judge Friedland's question. How would you have been disadvantaged because it was not disclosed a month earlier? Well, for one, Your Honor, as the government even pointed out below, it affects all aspects of the case in the pretrial preparation. You're still not answering the question. You're trying to hypothesize that the evidence didn't exist at all. But it did exist. And so the question is if it had been disclosed on a more timely basis, how would your client have been any better off? He wasn't hurt by the late disclosure. He was hurt by the existence of the evidence. That's a different kind of prejudice. That's right, Your Honor. Well, what is it that makes the second kind of prejudice something you can complain about now? Well, I don't think this analysis turns on the prejudice. The issues we've raised – It turns entirely on the prejudice. If the evidence gets in, your client's got a problem. And that's the problem that was faced upon the discovery that this evidence existed. It wasn't the late disclosure that was the problem. It affected his trial preparation, Your Honor. And that's why the judge gave him another, what, two weeks or a month to get ready. He could revise his trial approach. So that prejudice was taken care of by the continuance. Your Honor, I see that I'm out of time. If you have something to say in response to that, you may. Thank you. May it please the Court. Good morning, Your Honors. I'm Shelley Clemons with the U.S. Attorney's Office for the District of Arizona. Concentrating first on the first issue raised by defense counsel, the issue of the questions and answers regarding what defense claims were allegations of domestic violence. Again, I concur with Your Honor. This is a plain error analysis because the Court didn't permit the introduction of the evidence, which was key language in Wood. And since the Court didn't permit the introduction, defense counsel should have objected to preserve the error for anything other than plain error. By not doing so, he deprived the district court of the opportunity to, one, review the question and answer and see if there really, truly was a violation, and two, to make any corrections or curative instructions to the jury if possible. But in this particular case, it's very clear that there was no prosecutorial misconduct on the part of the government. The questions asked by the government were not intended in any way, shape, or at all to lead to any witness talking about domestic violence. Well, I mean, the question of how did you know it was him, her response seems to point to past history. What else is the question designed to elicit? The question was designed to elicit his identity. What we later got from her in further questioning was that she recognized his touch, his smell, how he handles her. The first question, again in a vacuum, was, you know, how do you know it was Donnie? And she's, you know, because she was screaming his name as he was stabbing her. Stop. Donnie, stop. And she says, because Donnie's always doing things. It's easy to kind of look at that after the fact now that we all know there are allegations of domestic violence, but keep in mind the jury did not know there were allegations of domestic violence. But they had already heard testimony from the victim in this case that Donnie was drunk that night, she didn't want to go home with him, that he had shaken her awake and was trying to get her to leave with him. And so it was very easy for them to infer that he's always doing things means he just doesn't listen to her and he wanted her to go home with him, that he wasn't going to take no for an answer. But he's always doing things. Doesn't that have to refer to past violence? No, it doesn't. It's insolubly ambiguous. It could mean he would make her leave. It could mean that he would wake her up even though she's expressed her wishes and that he's there wanting her to leave with him. But it doesn't mean any type of domestic violence. Again, when you don't know already what that actually means, there's no basis for this court to infer that that answer meant the worst possible meaning in this particular matter. And as to the answer, I know how he handles me. That's not entirely what she said. There was actually a statement there. The question was, how do you know it was Donnie? Do you know how he touches you? And she said, I just know how he handles me. It's just that I've lived with him so long, I know how he handles me, how he is with me. That indicates she recognizes his touch, his feel. She knows when he's in the room. He knows when he's the one who maybe comes up and puts his arm around her or walks up and pats her on the back. She knows it's him as opposed to somebody else. This is not a stranger to her. This is a man that she lived with for over a year and a half. She knows what that is. So there's absolutely nothing in that question and answer that would lead to any juror believing, oh, she's talking about domestic violence because it just wasn't there. What about know what he does to me? Again, Your Honor, I know what he does to me. I know how he feels when he touches me. It's in the context of him stabbing her, allegedly. So I don't see how that's anything other than some kind of reference to violence. Well, I think it was actually in the context of him shaking her awake and then stabbing her. So there was more to it than just that particular instance. But, again, we're talking about the context of the entire trial, and she's describing how she knows it's him. That's the answer she can give because she knows how he is. Does the prosecution have the obligation to prepare the witness to not violate the in limine order? Yes, Your Honor, and as we advised the court prior to trial starting, the witnesses were advised not to go into any instances of domestic violence. And where the questions aren't designed to elicit domestic violence, there can be no prosecutorial misconduct, and there can be no prejudice to the defendant. When the answers are so ambiguous, they don't clearly lead to a belief. This is what they were actually talking about. As to the last instance where Delilah Thomas testified, she was asked, you know, why did you run in there to check on the victim? And she said, they get into it here and there. Again, still very ambiguous. It says they, indicating mutual arguers. And they get into it could mean they just argue. It's also particularly benign in context when you take into account that her sister, Lelilah, who had the door right next to where this happened, her bedroom was right there, they were sleeping on the mattress right by her door, testified that she heard the victim screaming, stop, Donnie, stop. And she was even so close she could hear the physical body blows, the banging of this victim being stabbed. And yet she didn't come out of her room when it was all over because she didn't think anything about it until she heard her sister, Delilah, yell what she yelled, which then caused her to realize something more was going on. So in the context of the entire trial and the context of how these statements came out, they're particularly benign in this particular instance. Before your time is up, I would like to ask about something that didn't come up in the opening argument but did come up in the opening brief, and that are the references during closing argument made by the prosecutor to, among other things, defendants' lack of care about the impact on the minors there. And there are portions of that argument that are quoted, I think, in your brief as well. And the brief justifies that as being reviewing the evidence. I'm having trouble understanding how singling out defendant as being callous because he didn't care what the impact on these kids would be helps to identify defendant as the culprit as opposed to somebody else, and that was the issue at trial. It seems to me most of those comments tended toward the inflammatory to paint defendant as a bad guy, that he didn't care what the impact on the minors would be. How did that not cross the line? What was the utility of that argument? Well, Your Honor, I would agree that it doesn't necessarily go to the intent, but there is utility in that argument, and it was relevant. Well, intent's not really at issue here either. She was stabbed, what, 16 times? That's not an accident. Yes, Your Honor, but there was no stipulation as to any of the elements, and this intent goes to show the callousness of this. I'm sorry, the callousness of the offense, the way he committed it, how he committed it, goes to show intent, which was an element of the assault. Well, 16 times of stabbing is pretty callous. The fact that he didn't care about the impact on the minors with whom he had his own relationship, that doesn't say it's this person as opposed to some other person to me. I'm just not sure what the point of that argument was except to paint the defendant as a bad guy. Well, it painted whoever did it as acting in a particularly callous and intentioned, willful manner. But in this particular instance, the government's – Well, the argument here is the defendant didn't care what he did to them. You know what makes that even worse? These are his family, and then there's a paragraph about that, which doesn't distinguish this person from some other culprit who would have no relationship with him. This is painting this defendant as uniquely bad because it's his family, and he doesn't care about them. Your Honor, but the government, again, that was the evidence in this case, that this stabbing did occur in this room with two minors right there, one right next to the victim, one laying on the floor or on a bed right by the door where the defendant ran out. And that's the evidence that the government commented on. But the government didn't urge the jury to find the defendant guilty based off their claims that this was such a callous way that he handled it. We didn't use that inflammatory purpose in any way to otherwise claim that that's the sole reason they should find this defendant guilty. We were merely commenting on the evidence and also commenting on kind of the credibility of the witnesses, which was highly attacked by the defense counsel in cross-examination as well as in their closing, which came after these particular statements, but to show that this whole event and where these victims were and what they were seeing could play a part, one, in showing that they do remember this event, even though it was four and a half years before trial, because this is kind of where they were and it was a very traumatic type of event that occurred. And finally, Your Honor, even if it was a little close to the line, where there's substantial, incredible evidence to support the verdict, it cannot be shown by the defense that those particular statements affected the verdict. And in this particular case, identity was clear. Norma woke up screaming, stop, Donnie, stop. She knew it was Donnie. She knew him by his touch, by the smell of his cologne, by the way he was handling her. And moments before, he had attempted to wake her up and get her to leave with him, which she did not want to do. Her son heard the same argument. He was laying right there. Marcus was laying by the bed, heard the same argument, and he said the defendant was speaking in a mad, kind of mad kind of voice. And then moments leading, the stabbing occurs, the defendant runs out, and Marcus recognizes the defendant by his physical attributes, by his hair, by his clothing. So my time is up. Thank you. You've run out of time, but we'll give you a minute for rebuttal. Thank you very much, Your Honor. Judge Clifton, I just didn't want to leave your question hanging. I do want to address your question. And the answer turns on the fact that Mr. Jose isn't the one who wanted the continuance. The government wanted the continuance because it wanted to introduce inculpatory evidence that it had in its file for four and a half years, but neglected to turn over. Your client would have preferred to deny the continuance and exclude the evidence, but the court decided it was relevant evidence, so he gave you the time to prepare, thereby alleviating the problem of the late production. I disagree with that, Your Honor. He gave the government time to get the bad evidence in. Mr. Jose showed up for trial. Well, did your client need time to respond to the late production of evidence? He didn't ask for time to respond to the evidence. He didn't ask whether he asked. Did he need additional time? You just identified the problem with late production is that your client had planned his whole trial strategy on that evidence not being available. It was available, and so the judge responded to that concern by giving time so your client could prepare. Your client doesn't have the option of saying, no, I don't want to prepare against this bad evidence. Keep the bad evidence out. And the judge didn't give that option. It was actually, honestly, Your Honor, it was for both parties to prepare. The government hadn't listened to the tape either. There was no transcript made of the tape. It was to benefit the government just as much as they could. It doesn't matter. Our question is, how would you have been better off if you'd had even more time? Because that's what would have happened if they disclosed it earlier, so you would have had more time. So what would you have done differently? There are bigger picture problems here, Your Honor, and it's the skewing of the adversary process. The whole point of the discovery rules, the disclosure agreement, is to lay out the evidence, to let the adversary process play itself out on an even playing field. And then you show up for trial, the date set for trial, after the incident four and a half years before, and you're ready to go for trial. And then to give the government the benefit of extra time to introduce inculpatory evidence on the morning of trial, when the defendant with the constitutional right to go to trial is standing there ready to go, there are a number of concerns. We've listed eight of them in our brief that the district court didn't pay attention to. Thank you, Your Honor. I think we have your argument. Thank you. Thank you for the extra time. The case of United States v. Donny Jose is submitted.
judges: Clifton, Ikuta, Friedland